OPINION
Plaintiff, Cincinnati Companies ("Cincinnati"), appeals from a summary judgment rendered in favor of Defendant, Ford Motor Company ("Ford"), on Cincinnati's products liability claim.
Cincinnati's claim for relief arises from a fire in the engine compartment of a 1995 Mercury Sable automobile, resulting in damage to the automobile for which Cincinnati reimbursed the owner pursuant to a policy of insurance. Cincinnati subsequently commenced this action against Ford, which had manufactured the automobile, in subrogation to the rights of the owner.
Cincinnati alleged that Ford "negligently designed and manufactured the . . . automobile" and that the fire and resulting damage were proximate results of Ford's negligence. Ford denied the allegations.
Through discovery, Ford determined that Cincinnati would rely on the testimony of C. R. Spitler, a fire investigator, to prove its claim. Ford deposed Spitler, who testified that he had examined the Mercury to determine the origin and cause of the fire. Spitler opined that the fire was caused by an electrical short-circuit in a wire connected to the Integrated Control Module ("ICM") of the automobile. He offered no opinion concerning whether the short-circuit resulted from a design or manufacturing defect, as Cincinnati had alleged, stating that he is not qualified to offer an opinion on those matters.
Ford moved for summary judgment, arguing that Spitler's testimony demonstrates that Cincinnati could not prove the elements of a product liability claim required by the three-prong test set out in Lonzrick v. Republic Steel orp. (1966), 6 Ohio St.2d 227. The trial court agreed, finding that Cincinnati could not prove that the short-circuit resulted from a defect in the automobile's manufacture or design. Accordingly, the court granted summary judgment for Ford.
Cincinnati filed a timely notice of appeal. It presents four assignments of error.
 FIRST ASSIGNMENT OF ERROR THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE, THERE WAS A GENUINE ISSUE OF MATERIAL FACT WHETHER A MANUFACTURING DEFECT WAS THE CAUSE OF THE FIRE.
 FOURTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE, THERE WAS A GENUINE ISSUE OF MATERIAL FACT WHETHER A DEFECT IN THE DESIGN OF THE AUTOMOBILE CAUSED THE FIRE.
Due to the similarities of fact and law in the first and fourth assignments of error, we will consider them together.
Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is, on that record, entitled to judgment as a matter of law. All evidence must be construed most strongly in favor of the non-moving party. Civ.R. 56.
Product liability claims impose a burden on the claimant to prove three things; (1) that there was a defect in the product as it was manufactured and sold, (2) that the defect existed when it left the defendant's hands, and (3) that the defect was the direct and proximate cause of the defendant's injuries and losses. Lonzrick v. Republic Steel, Corp., supra.
Generally, direct evidence is used to prove each of the three Lonzrick prongs. In some instances, circumstantial evidence will satisfy the requirement involved. Adkins v. General Motors Corp. (1999),132 Ohio App.3d 556. One of those instances concerns proof of the defect itself, and is termed the "consumer expectation standard."
The consumer expectation standard permits a plaintiff to prove the first Lonzrick element, the existence of a defect, "if (the product) is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." State Farm Fire Cas. V. Chrysler Corp. (1988), 37 Ohio St.3d 1, 6. In design defect claims, though not in manufacturing defect claims, that finding also supports an inference that the defect existed when the product left the manufacturer's hands, the second Lonzrick prong, absent evidence of a substantial change in the product since that time. Id. Even so, the consumer expectation standard does not permit an inference concerning causation, the third prong of Lonzrick. The causation prong requires a plaintiff "to establish causation — to prove by a preponderance of the evidence that it was some aspect of the challenged design which rendered the product less safe than the ordinary consumer would expect, resulting in injury." Id., at p. 7.
Here, a fire spontaneously occurred in the engine compartment of the automobile, that spread to consume the vehicle and resulted in the losses that Cincinnati suffered. That is evidence from which reasonable minds could find that Ford's product was more dangerous than an ordinary consumer would expect. That finding permits two inferences under the consumer expectation standard. First, it permits an inference that a defect existed, the first Lonzrick element. Second, absent any evidence in this record of a substantial change in the vehicle's condition, and none exists here, it permits an inference applicable to Cincinnati's design defect claim that the defect existed when the auto left Ford's hands, the second Lonzrick element. Cincinnati was yet required to prove, by other evidence, the third Lonzrick element, that the defect was the direct and proximate cause of its injuries and losses.
In State Farm, supra, a fire also occurred spontaneously in an automobile, consuming the automobile and damaging the owner's home. The plaintiffs offered evidence in the form of expert opinion that the cause of the fire was an electrical malfunction under the vehicle's dashboard, which most likely occurred when one of the wires retained an electrical charge after the vehicle was stopped and parked in the owner's garage. However, the specific wire involved could not be identified, perhaps because of the damage that resulted. The Supreme Court held that the causation prong of Lonzrick, supra, was not satisfied.
Here, the condition of the vehicle apparently did not prevent an examination by Cincinnati's expert, Spitler. His deposition testimony produced the following findings and conclusions:
 A. There was a plug that, the wiring that came out of the Integrated Control Module went into this plug, and then the wiring out of the plug went to the fan. The plug was just melted down to almost a ball.
Q. So, it was an area of intense heat?
 A. Yes. And the wiring to the Control Module, there were a couple of wires that showed some intense burn, with the insulation burnt off. But not all the wiring showed that. There was some that showed that the wiring was, the insulation was still in tact [sic].
Q. On the Control Module?
 A. On the Control Module. But the wiring going to this connector had all the insulation burnt off, and the connector was melted down into a ball.
Q. What did that indicate to you?
 A. Whatever wiring went to that particular connector was the cause of this particular fire.
 Q. So, that was focused in from the origin to the particular site?
A. That's correct.
Q. Of the fire?
 A. Yes. So I took that connector apart, and that's when I found this piece of wiring that had some additional welding and shorting taking place.
Q. When you say additional welding, what do you mean?
 A. Intense heat had caused the copper wiring to — the braided copper wiring to weld together.
 Q. That does not necessarily mean that anything particular went wrong with that wiring, but only that it was in an areas of intense heat?
 A. There's pro and con along those lines. In my opinion that's in the area that caused the fire, which would indicate that that particular wire, which was a hot lead, was probably the cause of this particular fire. It is certainly in the area of the fire.
 Q. But you can't determine for certain, other than that that wire was absolutely in the area of intense heat, can you?
 A. Are you asking me did it result as a cause of the fire, or a result of being in the area of the fire?
Q. Well, you explained to me an area of origin of a fire.
A. Correct.
 Q. We have a V pattern to define that area. We have intense heat in that area, with white heat. We have intense melt with wires welding, and other indications, parts, plastic parts melted, I think you mentioned.
 If we have now focused down to a smaller area of our cause, simply because a part shows intense heat or intense melt, does that tell you for certain that that particular piece was the cause, or simply that it's in the area of the cause?
A. In my opinion that was the cause.
 Q. Okay. How do you tell whether something is, if you have pieces next to each other, or parts next to each other, and they're both closely situated, how do you tell which one has intense heat and intense melt because it was next to the cause?
 A. Normally you won't have that. If it's wiring that's the cause of the fire, that's going to be shorted and welded. The wiring directly beside of it could have sustained some intense amount of heat, however, it's not going to be shorted and welded.
Q. And what does welding look like?
 A. If you can picture a braided wire in your mind. An extension cord, for example, it has braided wire. Normally it's really flexible. If you push it the braids are gonna' come apart and all that. We would mention that that got so hot as a result of a short taking place that all those braids are — I want to say welded together, but that's not proper terminology, probably because we're talking about a weld. All those braids are put together into one strand, so to speak.
Q. You're saying they are like melted together?
 A. Well, copper melts at 1200 degrees, and that doesn't get that hot, but welded together is really what I'm trying to say. The braids are not braided any more, they are welded into one piece.
Q. You couldn't separate them?
A. That's correct.
 Q. Okay. You also mentioned that it showed, other than welding, it showed a short?
 A. Yeah, it's by beading. And that's an area that, if you want to look at Photograph Number 13, it'll show that small bead in that area.
Q. What do you mean by beading?
 A. That green area. There's a bead. And again, there's pro and con as to beading, whether it's the cause of the fire or happened as a result of the fire. However, in this case the fact that the braided wire was welded, I would say that it was the cause of the fire.
 Q. Okay. And when we are talking again as the cause of the fire, we're talking in terms of the specific location of the start of the fire?
A. Correct.
Spitler Dep. at 53-56 (emphasis added).
Spitler's testimony was proof of causation which related some aspect of the automobile's design, the specific wire that melted from intense heat to cause the fire, to the losses that Cincinnati suffered. Applying the standards that Civ.R. 56(C) imposes, that evidence is sufficient to prove causation, the third prong of Lonzrick.
The first assignment of error is overruled. The fourth assignment of error is sustained.
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN FINDING THAT THERE WAS NO EVIDENCE TO SUGGEST THAT THE 1995 MERCURY SABLE WAS IN THE SAME CONDITION ON THE DAY OF THE FIRE AS IT WAS ON THE MANUFACTURE DATE, WHEN THERE WAS TESTIMONY IN THE RECORD THAT THE CAR WAS NEW, UNDER WARRANTY, AND WAS IN THE SAME CONDITION AS WHEN MANUFACTURED.
 THIRD ASSIGNMENT OF ERROR THE TRIAL COURT COMMITTED ERROR BY NOT APPLYING THE DOCTRINE OF RES IPSA LOQUITUR.
These assignments of error are rendered moot by our determination of the fourth assignment of error. Therefore, pursuant to App.R. 12(A)(1)(c), we decline to determine them.
 Conclusion
Having sustained the fourth assignment of error, and having overruled the first, second, and third assignments of error, we will affirm the trial court's judgment in part and reverse, in part. We remand the cause to the trial court for further proceedings on the design defect claim.
 ____________ GRADY, J.
WOLFF, P. J., and KERNS, J. concur.
Hon. Joseph D. Kerns, retired from the Court of Appeals, Second Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.